## THE STATE OF KANSAS v. THOMAS C. KIRBY.

**No. 11,797.** (63 Pac. 752.)

1. MURDER—*Allegation and Proof.* Murder may be committed by several means, and where both shooting with a pistol and with a shot-gun may have contributed to produce the death of the deceased, both means may properly be alleged in a single count of the information, and proof that death was caused by either will sustain the charge.

2. ——— *Information — Case Followed.* Following *The State v. McGaffin*, 36 Kan. 315, 13 Pac. 560, it is *held*, that the information herein contains the essential averments of a charge of murder.

3. ——— *Evidence of Conversation.* A conversation participated in by defendant, his wife, and the deceased, and which was material in the case, was all admissible in evidence, including what was said between the defendant's wife and the deceased in the defendant's presence.

4. ——— *Explanation of Statement by Defendant.* Testimony was offered by the state of ambiguous statements made by the defendant before the homicide which, it is claimed, indicated a purpose to take the life of the deceased. The defendant admitted the making of a part of the statements, and desired to explain his meaning and the sense in which the words were used, but the court refused to hear any explanation as to what was in his mind when the statements were made or of the intent with which the language was used. *Held,* error.

5. ——— *Testimony as to Other Offenses.* Testimony as to the commission of offenses by defendant not in any way connected with that charged in the information, and which would tend to degrade and prejudice him, should be carefully excluded from the jury.

6. ——— *Probability of Knowledge by Defendant of an Ultimate Fact.* The general rule is that where knowledge of an ultimate fact is in issue, testimony that it is a matter of general reputation in the community is competent as tending to trace notice to the party sought to be charged, but such testimony is never admissible unless the person sought to be charged with notice stands in such relation or is so situated as to render it probable that he would be informed of what is generally known.

7. ——— *Knowledge of Certain Gossip Improbable.* There is no such probability that neighborhood gossip and reports or reputation of the unchastity of a daughter will reach a father as to

make such evidence receivable against him in a prosecution for murder, where his defense is that information of the seduction of the daughter excited him to uncontrollable passion and to an insane impulse to kill the seducer.

Appeal from Jefferson district court. MARSHALL GEPHART, judge. Opinion filed February 9, 1901. *In banc.* Reversed.

*A. A. Godard,* attorney-general, *Oscar Raines,* county attorney, and *Schaeffer & Phinney,* for The State.

*David Overmyer,* and *Morse & Casebier,* for appellant.

The opinion of the court was delivered by

JOHNSTON, J.: On the morning of December 21, 1899, Thomas C. Kirby shot and killed G. A. Foley, at Perry, Kan. Kirby owned a hotel at Perry, which he managed and operated with the assistance of his wife and children. Foley was station agent for the Union Pacific Railway Company at that place, and lived at Kirby's hotel for some time before the homicide, and it is claimed that while there he seduced Clara Kirby, a daughter of the defendant. The seduction and condition of their daughter came to the knowledge of Kirby and his wife, it is claimed, on December 14, 1899, when they had an interview with Foley and endeavored to have him marry Clara and, so far as possible, make reparation for the wrong done her and her family. This he declined to do, and, when further pressed to marry the girl, stated that it was impossible to do so, as he had been married and had a wife living. Clara was taken to Topeka by the defendant, where an examination was made by a physician, and his report confirmed the fears of the Kirbys as to the condition of their daughter.

In behalf of the defendant, it is claimed that the dis-

closure and disgrace first stupefied him; then, as he came to realize the real nature and effect of the wrong done to his daughter, and that there was no disposition on the part of Foley to make amends or to protect the reputation of the girl, he became more and more excited, and ultimately gave way to uncontrollable passion and to the insane impulse to take the life of Foley, who had so greatly wronged his daughter and humiliated and degraded the family. His claim and testimony is that on the morning of the tragedy, one week after the disclosure, he went to the room of Foley and demanded again to know what Foley was going to do as to his daughter, and was informed by Foley that he did not intend to do anything, when the defendant told Foley that he would prosecute him and put him behind the bars for his wrong and crime; that Foley thereupon rushed upon the defendant, declaring with an oath that he would kill him; whereupon the defendant drew his revolver to defend himself, but Foley grabbed the weapon, and in the scuffle which followed the revolver was discharged and the bullet struck the defendant's ankle and foot. The defendant finally gained control of the weapon and fired, striking Foley on the shoulder, and then he laid down the revolver and took up a shotgun that was near by and shot Foley, who was still aggressively attacking him, the loads from both barrels taking effect in the latter's breast. Foley ran down-stairs and out of the house, pursued by the defendant, who was wild with excitement and passion, and who with the revolver, which he had picked up again, fired another bullet into Foley's body. Foley fell on the sidewalk and in a few minutes afterward died.

On the part of the state, it is claimed that Kirby was not greatly disturbed when he learned of his daugh-

ter's condition ; that he allowed Foley to continue as a guest of the hotel for a week following the disclosure ; that, even if he had been excited and stirred to desperation when first told of his daughter's misfortune, there was a week of time for the cooling of his passions and in which to regain control of his reason ; that his conduct in borrowing weapons, purchasing ammunition and otherwise making preparations betrayed deliberation and a malicious purpose to kill, and this, with certain threats alleged to have been made by the defendant, and other testimony, tended to show that the killing was not done under any insane impulse or in self-defense.

Kirby was prosecuted for murder, and the charging part of the information was as follows :

"That on the 21st day of December, A. D. 1899, in said county of Jefferson and state of Kansas, one Thomas C. Kirby, then and there being, did then and there unlawfully, feloniously, wilfully, deliberately and premeditatedly, and with malice aforethought, kill and murder one G. A. Foley, then and there being, by shooting him, the said G. A. Foley, with a certain gun commonly called a shot-gun, then and there loaded wi⁑ powder and leaden shot and leaden bullets, and by then and there shooting him, the said G. A. Foley, with a certain pistol, commonly called a revolver, then and there loaded with powder and leaden bullets, which said shot-gun and said pistol, both so as aforesaid loaded with powder and leaden shot and leaden bullets, he, the said Thomas C. Kirby, then and there in his hand and hands had and held—a more definite description of said shot-gun and said pistol is to this informant unknown—contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Kansas."

Upon this charge a trial was had, which resulted in a verdict finding the defendant guilty of murder in the second degree.

In his appeal the defendant questions the sufficiency of the information, arguing that it is bad for duplicity, in that it charges two acts of killing, each with a distinct weapon, and that in fact two independent offenses are charged in a single count. This contention is not sound. Only one offense is charged, and that is the wilful, premeditated and felonious killing of Foley by the defendant, at a stated time and place, by shooting him with a shotgun and with a revolver. Death may be produced or murder committed by several means, and since both the shooting with the pistol and the shot-gun may have contributed to produce the death of Foley, both means may properly be alleged in a single count, and proof that death was caused by either of the means will sustain the charge. (*The State v. O'Neil*, 51 Kan. 651, 33 Pac. 287, 24 L. R. A. 555; *The State v. Hewes*, 60 Kan. 765, 57 Pac. 959; *The State v. Kornstett*, ante, p. 221, 61 Pac. 805.)

*1. Information not bad for duplicity.*

While the information does not in so many words allege that the wounds were inflicted by the shooting, or that they were mortal and resulted in death, it does allege distinctly that Foley was killed and murdered by the defendant at a fixed place and upon a certain time, by means that are described, and in language that can leave no doubt as to the character of the wounds inflicted or the cause of the death. We think the information contains the essential averments of a charge of murder. (*The State v. McGaffin*, 36 Kan. 315, 13 Pac. 560.)

*2. Case followed.*

Many exceptions were taken to rulings upon testimony, only a few of which require consideration and comment. The defendant sought to prove the provocation for the intense feeling and passion which possessed him when the killing was done, and was

permitted to show the betrayal of the daughter and a part of what was said at the conference which occurred between Foley and the defendant and wife soon after the relations between Foley and the daughter had come to the attention of the defendant.  What was said between Foley and the defendant that would stir the feelings and rouse the passions of defendant was received without objection, but when the conversation on the same subject between Foley and defendant's wife, in presence of defendant, was offered, a general objection was made, which the court sustained.  This ruling was erroneous. All three participated in the interview, and what was said pertinent to the subject between Mrs. Kirby and Foley was just as competent as the conversation between Foley and the defendant.  Whether this error alone is so prejudicial as to require a reversal it is not necessary to determine.

*3. Evidence of conversation.*

Testimony was given of vague statements said to have been made by defendant before the homicide, indicating a purpose to kill or get rid of Foley.  In his testimony the defendant stated that he did say to a witness that one boarder had gone, and "that there would be some more in the same fix in a few days, or by to-morrow, or something like that."  He was then asked, "What did you mean by that?" but the court, on general objections, excluded the answer, or any explanation of what was in his mind, or to whom he referred in his statement.  It was important testimony, and probably made an impression upon the minds of the jurors. The statements were offered by the state, and were interpreted as hints at violence and threats against Foley, who was killed the next day.  The defendant admitted a part of the statements claimed to have been made

*4. Explanation of statements improperly excluded.*

by him, and desired to explain his intention or the sense in which the words were used. He claimed the explanation he would have made was that one of the boarders had failed to pay his board and had been turned away, and that he referred to another boarder who was also in default and would also be turned away. The statements used were open to more than one interpretation, and the defendant, who was on trial for his life, was certainly entitled to tell the jury what his intention was.

In *Gardom v. Woodward*, 44 Kan. 758, 25 Pac. 199, a case involving the good faith of the transfer of property, it was held that the party might testify directly as to his intention and the state of his mind with respect to the transfer. In deciding the case it was said:

"If the condition of a man's mind with reference to what he thinks, feels, believes, intends and his motives is always a fact, and it is a fact which is often required to be ascertained both in civil and criminal cases, and only one person in the world has any actual knowledge concerning that fact, and that person is the one whose condition of mind is in question, and where he is a competent witness to prove such condition, he may testify to the same directly." (See, also, *Bice v. Rogers*, 52 Kan. 209, 34 Pac. 796.)

The testimony against the defendant of the implied threats was admitted to show a criminal intent, and, since intent may be thus proved indirectly, no reason is seen why it may not be proved directly; and his testimony of the meaning and intent of the language used, instead of being a mere inference, is based on consciousness and actual knowledge. See, also, *Commonwealth v. Woodward*, 102 Mass. 155; *Seymour against Wilson*, 14 N. Y. 567; *Nash v. Minnesota Title Ins. & Trust Co.*, 163 Mass. 574, 40 N. E. 1039, 28 L. R. A.

753; Abbott, Trial Ev. 780; Whart. Ev. § 508; 14 Alb. L. J. 387.

The defendant's wife was called as a witness in his behalf, and on cross-examination the court, over objection and protest, permitted the state to ask a number of questions as to other and distinct offenses committed by the defendant, which would tend to blacken and degrade him in the eyes of the jury. She was interrogated as to whether he had not maintained a "joint" in the hotel, harbored lewd women there, and whether he had not used and permitted the use of rooms in his hotel for gambling purposes. To most of the inquiries she gave a negative answer, but the state was thereby allowed to insinuate charges and offenses other than the one alleged in the information, and the questions implied an assertion of belief on the part of the attorneys for the state that the defendant was guilty of the other offenses. In respect to keeping gambling-rooms, the witness said that she did not know that the defendant did carry on or allow gambling in the hotel, but, on persistent questioning, she was compelled to admit that she had seen men playing cards in the rooms of the hotel, but did not know that they were gambling. The charge of gambling imputed by this question is a felony, and it has no connection whatever with the offense of murder, which was in issue, and there is no justification or excuse for the allowance of these questions. To a series of questions the witness was required to answer whether the defendant had not permitted lewd women to come and stay at the hotel for days at a time, and whether at times within two years prior to the homicide the defendant had not required her to carry refreshments to rooms occupied by lewd women. To these ques-

5. Improper testimony as to other offenses.

tions her answers were substantially in the negative
form, but they were qualified by stating that it was
not within her knowledge and not within her memory.
Another question admitted over objection was whether
her husband had not for a long time prior to December
1, 1899, run a ''joint'' in room No. 6 of that building.
She answered the question by saying that people said
that he did ; that she did not see anything sold ; and
when inquiry was made as to whether she did not know
it, her answer was : ''I do not suppose I knew it.''
The court struck out her answer that people said he
ran a ''joint,'' and allowed the remainder to stand.

These offenses and misconduct, which were made
the subject of inquiry, were not linked in any way
with the offense charged in the information.   The
general rule is that the charge upon which a person
is being tried cannot be supported by proof that he
committted other offenses, even of a similar nature.
Evidence which legitimately tends to support the
charge or show the intent with which it is committed
is not to be excluded on the ground that it will prove
other offenses, but the other offenses inquired about
in this case do not fall within any of the exceptions
to the general rule.   Presumably the defendant came
to the trial prepared to answer the charge of murder ;
but since no other charge was made against him, it is
not to be expected that he was prepared to answer the
offenses of the unlawful sale of liquor, the keeping of
a gambling establishment or a house of prostitution.
The allowance of the questions, which were persis-
tently put with the sanction of the court, together
with the halting and qualified answers of the witness,
was a manifest injustice to the defendant, and must
have created a prejudice in the minds of the jury
against his general character.

A number of witnesses were called by the state to testify to the character of Clara Kirby for chastity and virtue.   The form of the question put was whether the witnesses "knew her reputation for chastity and virtue prior to December 21, 1899," and in this way evidence of an impeaching character was elicited.   The questions, if relevant and competent for any purpose, were objectionable in form.   When character is in issue, the law limits the inquiry to general character, and not to specific acts ; not the estimate of a few, nor the opinion of a part of the community ; but it can be shown only by common report, general reputation and opinion generally entertained of the party in the community where he lives.   The questions asked did not call for general reputation ; but is the character or reputation of a person other than the defendant a proper subject of inquiry?

<div style="margin-left:2em; font-size:smaller;">6. Testimony as to daughter's reputation.</div>

Prosecutions are very rare where evidence of the general character of any one besides the accused is admissible.   Of course the character of a witness in the case is open to attack, but there the inquiry is limited to the general character of the witness for truth and veracity. ( *The State v. Eberline,* 47 Kan. 155, 27 Pac. 839.) While Clara Kirby was a witness in the case, the challenged testimony was not admitted to impeach her credibility, and the jury were instructed that it was not competent for that purpose.   In trials for seduction and rape, the character of the prosecutrix for chastity is involved, and proof like that in question may be received.   So, also, is character directly in issue in libel cases ; and the character of the deceased may be the subject of inquiry in some cases of homicide, where the claim is that the defendant acted in self-defense.   It is easy to understand

why the law permits an examination into character in these as well as in a few other cases that might be mentioned ; but in none of them is the issue of character so remote or a showing by testimony of reputation so questionable as in the case before us. The moral character of the defendant could not be attacked by the state, unless he offered evidence of his good character ; and yet here the state was allowed to produce evidence of the moral character of an outside party against the defendant, when the issue was his guilt or innocence of a charge of murder.  The state contends that it was competent to trace knowledge of his daughter's unchastity to him because of his claim that the knowledge of the seduction excited his passions and drove him to desperation and to kill the seducer ; and that if such knowledge were traced to him months before the homicide, the claim that his mind was unhinged by the story of the seduction would be contradicted and overthrown.  If it be assumed that he had heard reports derogatory of his daughter's character, who can say that information from herself of her seduction by a guest of the house, and of her pregnancy, would not arouse his passions or affect his mind?  Again, who can say that reports of the unchastity of a daughter would probably come to a father, and that, if any one was so bold as to repeat to him rumors impeaching her virtue, he would believe them?  Our attention is called to the general rule that where knowledge of an ultimate fact is an issue and provable, evidence that it is a matter of general reputation is competent as tending to trace notice to the party sought to be charged with notice, but such proof is never admissible unless the person sought to be charged with notice stands in such rela-

tion or is so situated as to render it probable that he would be informed of what was generally known.

Counsel for defendant well say that the father would be the last one to hear reports of the lewdness of a daughter. All know that any ordinary person would not only hesitate to believe such rumors, but would also shrink from relating them to the father or speaking of them in his presence. The cases in which people would carry gossip as to the unchastity of wife, daughter or sister to the male members of a family would certainly be exceptional, and would never occur except under extraordinary circumstances. Instead, then, of its being probable that the father would be informed of these reports, we think it contrary to all reasonable expectation, and that they might be heard by almost every one in the community and yet the father be in complete ignorance of them. Again, if a bad general reputation of the daughter was shown to exist, and that notice of the same had been brought to the father, his belief in the reports must still be assumed in order to say that his mind was not affected when he heard from his daughter's lips the story of her seduction by Foley. How can any matter of fact be assumed against a defendant charged with murder where the law requires that every just presumption of fact as well as every reasonable doubt must be resolved in his favor. As we have seen, it was unlikely that he would hear the reports, and, without other and better testimony, it is contrary to reason to hold that he would believe them; and if he did not give them credence he was necessarily in the same situation and would be affected by the story of the seduction the same as though he had not heard the reports. It should be said that, aside from the opinions of the

*(margin note: 7. Improbability of gossip's reaching the father.)*

witnesses as to reputation, there is no testimony showing that the defendant ever heard a whisper or entertained a suspicion against his daughter's character until he heard the story of her seduction by Foley. Our conclusion is that the testimony, even if it had been in proper form, was inadmissible as against the defendant. ( *Tucker v. Constable,* 16 Ore. 407, 19 Pac. 13 ; *Carter v. Carter,* 62 Ill. 439 ; 5 A. & E. Encycl. of L., 2d ed., 871 ; Gillett, Ind. & Col. Ev. § 296.)

Other objections to the exclusion of testimony are taken, but they are rendered immaterial by the fact that subsequently the court admitted the testimony in answer to other questions.

Some other exceptions are taken, but they do not appear to us to be sufficiently material to require particular attention or comment ; but, for the errors pointed out, the judgment must be reversed and the cause remanded for a new trial.