[No. 9870. Department One. April 8, 1912.]

## WILLIAM G. MALLOY, *Appellant*, v. JEROME L. DRUMHELLER, *Respondent*.[1]

CONTRACTS—PROMOTER'S AGREEMENT— CONSTRUCTION — CONDITIONS —PERFORMANCE—ACTIONS—INSTRUCTIONS. Where an agreement between promoters of an electric company provided that defendant, who had put up the money and retained certain shares and bonds and had borrowed $16,000 for the purpose of carrying the bonds, would, in consideration of the plaintiff's past services, upon payment within six months of half of the sum borrowed to carry the bonds, assign one-half of the bonds and one-half of the remaining stock to the plaintiff, and the plaintiff testified that the agreement was understood to require him to sell the bonds at any time within six months in order to earn one-half of the stock, a purchase or sale of the bonds was a condition precedent to plaintiff's ownership of any part of the stock; and in an action for breach of contract, the jury was properly instructed to that effect and that the agreement itself did not make the plaintiff owner of the stock until he had performed the conditions.

SAME—OPTION—RELINQUISHMENT. In such a case, where it appears that defendant for a time requested plaintiff not to make any effort to sell the bonds, as he contemplated taking them himself as a permanent investment, but later plaintiff advised an immediate sale because of competition by a new company, and defendant finally sold both the bonds and stock before the expiration of the six months, an instruction as to plaintiff's rights, if the jury find that the defendant prevented him from performing the conditions, is not objectionable in that it refers to the agreement as an "option," and that plaintiff could not recover if he consent to the defendant's acts and relinquished any rights he had under the agreement.

SAME—TERMINATION. In such a case, it is proper to instruct that the parties had a right to terminate the "option" agreement, and that it would be terminated by an agreement that the defendant should retain the bonds together with the stock bonus for his private investment, remaining stock to be equally divided between them.

EVIDENCE—INTENT—ADMISSIBILITY. Where the character of a transaction depends upon the intention of a party, he may testify what his intent was, its weight being for the jury.

EVIDENCE—WEIGHT AND SUFFICIENCY — LETTERS — MAILING — PRESUMPTION. Testimony that a letter was properly addressed and

[1]Reported in 122 Pac. 1005.

mailed, with a return card, and that the letter was not returned, raises a presumption that it was received, and where its receipt was denied, the question is for the jury.

CORPORATIONS — STOCK AND BONDS — OWNERSHIP — TITLE OF PROMOTER. Where a promoter bought an electric light plant, incorporated a company, sold the plant to it and took stock and bonds in payment, he is the owner of the stock and bonds and not a trustee for the corporation, and it is immaterial that he borrowed the money to put the deal through.

CONTRACTS—PROMOTER'S AGREEMENT — MODIFICATION — EVIDENCE— SUFFICIENCY. One of two promoters cannot be heard to rely upon a letter from the other intimating that he might hold certain bonds as a permanent investment, thereby abrogating a prior agreement for their sale, where shortly after receipt of the letter he wrote the sender of threatened competition, advising an immediate sale, knowing that he would not thereafter desire to hold the bonds as a permanent investment.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered June 27, 1910, upon the verdict of a jury rendered in favor of the defendant, in an action on contract. Affirmed.

*Post, Avery & Higgins,* for appellant.
*Reese H. Voorhees,* for respondent.

GOSE, J.—This is an action to recover one-half the price received by the defendant for 2,900 shares of the capital stock of the Pend d'Oreille Electric Company, a corporation, which the plaintiff claims to have owned jointly with the defendant. There was a verdict and judgment for the defendant. The plaintiff prosecutes the appeal.

The preliminary facts, essential to a consideration of the appellant's first and second assignments of error, are as follows: In August, 1902, the appellant and the respondent entered into a written contract of partnership for the purpose of carrying on the real estate, insurance, and commission brokerage business, in the city of Spokane, which the respondent was then conducting. The contract was to continue for one year, but by mutual consent continued until

June or July, 1906. On August 21, 1905, the Sandpoint
Electric Company, a corporation, owned an electric light
plant, together with certain franchises in the town of Sand-
point, Idaho. One M. R. Rutherford was its president, and
owned its entire capital stock with the exception of two
shares. On the date stated, Rutherford and the respondent
entered into a contract, in writing, whereby the former
agreed to transfer to the latter the entire capital stock of
the corporation, less two shares; and further agreed to cause
the corporation to transfer to the respondent the entire
plant, together with its franchise, for a consideration of
$30,000. It was agreed, that the respondent should organize
a corporation to be known as the Pend d'Oreille Electric
Company; that he should transfer to it the entire plant and
franchise, and that he should cause it "to authorize the issu-
ance of fifty thousand ($50,000) dollars worth of bonds, in
denominations of five hundred ($500) dollars each, payable
ten (10) years after their date and bearing interest at six
(6) per cent, thirty thousand ($30,000) dollars worth of
said bonds to be issued immediately after said organization,
and the said entire issue to be secured by a mortgage on all
the property so acquired from the said Sandpoint Electric
Company."

It was further agreed that the respondent should cause to
be delivered to Rutherford bonds in the Pend d'Oreille Com-
pany of the par value of $9,000. These bonds, with the
$21,000 paid by the respondent, paid the purchase price. On
August 26, following, the respondent caused the Pend
d'Oreille Electric Company to be organized, with a capital
stock of $50,000 divided into 5,000 shares of stock of the par
value of $10 each, of which he subscribed 4,996 shares, the
appellant one share, and three other persons one share each.
On September 20, the respondent offered to sell the plant and
franchise to the last-named corporation, for a consideration
of $79,960, $49,960 to be paid by the issuance to him of

4,996 shares of its capital stock; the remaining $30,000 to be paid, to quote from his offer, as follows:

"As soon as I shall have conveyed the property to your company you are to authorize the issuance and actual issue of fifty thousand dollars ($50,000) worth of first mortgage gold coin bonds of the denomination of five hundred dollars ($500) each, and bearing interest at six per cent (6) per annum, payable semi-annually, and maturing in ten years from date. Such bonds are to be secured by a first mortgage on all the property of the company transferred to you, and you are to issue and deliver to me the balance of the purchase price, thirty thousand dollars ($30,000) worth of said bonds."

This proposition was unanimously accepted by the corporation, by a resolution duly entered upon its minute book. In pursuance of these negotiations, the property was regularly conveyed to the respondent, and the $30,000 in bonds were issued and delivered to him. He then conveyed the plant and franchise to the Pend d'Oreille Company, and delivered to Rutherford the bonds of the company of the par value of $9,000. He sold bonds of the par value of $5,000, together with 500 shares of the capital stock of the latter company, to one Farmin, for the sum of $5,000, and borrowed $16,000 which, with the $9,000 bonds, paid the purchase price.

Before the sale of the plant to the respondent, the appellant had for some time been negotiating for its purchase from the Sandpoint company, for a water company at Sandpoint, in which both he and the respondent were interested. This project having failed of consummation, the respondent, with the assistance of the appellant, made the purchase in his own behalf. On October 11, 1905, the respondent penned the following instrument, which the appellant then typewrote in duplicate:

"Spokane, Wash., Oct. 11, 1905.

"Mr. William G. Malloy, Spokane, Washington.

"Dear Sir:—This will serve as a memorandum to the effect that on the 21st day of August, 1905, I purchased from

the Sandpoint Electric Company its electric lighting plant at Sandpoint, Idaho, in consideration of the sum of $30,000, and that on September 20th, 1905, I sold the said lighting plant to the Pend d'Oreille Electric Company, in consideration of the sum of $79,996, represented by 4,996 shares of the stock of the said Pend d'Oreille Electric Company, and of sixty (60) first mortgage gold bonds of the said company of the denomination of $500 each, amounting in the aggregate of $30,000, said bonds drawing interest at the rate of six (6) per cent per annum, payable semi-annually, and maturing ten years from date. These bonds are secured by a first mortgage on the entire holdings of the Pend d'Oreille Electric Company for $50,000, in favor of the Washington Trust Company, of Spokane, Washington, as trustee. I have since sold $9,000 worth of these bonds at par to Mr. M. R. Rutherford, and I have also sold ten of these bonds and five hundred shares of stock of the said company to Mr. L. D. Farmin for $5,000, and I now own and hold 4,500 shares of the stock of the said company and thirty-two (32) bonds of the denomination of $500 each of the par value of $16,000.

"On September 19th, 1905, I gave my promissory note to the Traders National Bank, of Spokane, Washington, payable on demand, for $16,000, drawing interest at the rate of 7 per cent per annum, for the purpose of carrying these bonds until such time as they are sold; the price at which the bonds are held being understood to be at par and accrued interest, carrying with it a bonus with the sale of each bond of $500 fifty (50) shares of stock of the said company.

"Now, in consideration of your good offices in persuading me to buy the said Sandpoint Electric Company's plant, and for services rendered in assisting me in the sale of the said bonds and stock of the Pend d'Oreille Electric Company sold to date, I agree at any time on or before April 10th, 1906, to deliver to you or order upon payment to me of one-half of any amount of the $16,000 worth of bonds still unsold at that time, as well as one-half of any stock remaining in my name, after giving a bonus of fifty (50) shares of stock with each bond of $500 sold.

"It is understood and agreed also that in the event that you take up the stock and bonds within the term of this option, you are to pay me one-half of the interest due on the

$16,000 note accrued or paid by me at the time of your pur-
chase.                          Respectfully, J. L. Drumheller."

Each of the parties retained a copy of this instrument. A
few days later the respondent went to New York where he
remained until early in January, 1906, when he returned to
and remained in Spokane. On October 27, the respondent
wrote the appellant:

"Prospects are favorable at this time for making my
Barium sale. I will know within a couple of weeks. For the
present do not make any further effort to sell the remaining
16,000 bonds in Spokane, as I believe I will be in a position
soon to take them myself and receive the stock bonus. In
that event, I shall endeavor to sell the bonds here without a
stock bonus."

On November 11, he wrote:

"The prospects are brighter again for making a sale on
my Barium stock. Negotiations are still pending. Will not
know definitely yet for a few weeks. . . . I wish you would
make application for a new franchise for our light company
at Sandpoint at the earliest favorable moment."

On November 22, he wrote that the sale of his Barium stock
seemed probable, and that:

"In the meantime I will ask you (not) to do anything to-
ward making a sale of the bonds of Pend d'Oreille Company
as the prospects are favorable for me in taking the whole
thing for myself as an investment."

On November 25, he wrote:

"Kindly ascertain at the bank the date that I gave them
my note for $16,000 and the amount that will be due on
December 6th. I hope to retire the note on or about that
date. In that event I will hold the bonds with a bonus of
stock going with it as a private investment. If I decide to
take these bonds and stock bonus as my own investment, we
will then issue the balance of the stock as originally agreed
upon, one-half to yourself and the other half in my name."

On December 9 he wrote: "I am expecting to get my

money from the sale of the Barium stock about January 1."
On November 27, 1905, the appellant wrote the respondent:

"Am glad the prospects are good for selling Barium, and
would be glad to have you let me know at the earliest date
what you intend to do in regard to the balance of the bonds,
for as you know it is important that I should be in a position
to take care of my share and would not like to miss an oppor-
tunity to at least reduce the amount as much as possible."

On December 11 the appellant wrote the respondent:

"Am glad to learn that you are going to make your
Barium deal and note that in that event that you do you in-
tend taking the bonds yourself and I am sure you could not
make a better investment."

On December 14 he wrote, acknowledging receipt of the
respondent's letter of the 9th inst., and advising the respond-
ent that the "Humbird" people were going to apply to the
authorities at Sandpoint for "a franchise to compete with
us;" that,

"This puts an entirely different phase on the investment
and one that I have never anticipated, and if we are going
to be at the mercy of these people I would recommend that
we endeavor to sell with the least possible delay all the re-
maining bonds, and hold on to our stock as we at first planned.
. . . I think that, unless you are able to dispose of these
bonds in New York, you had better arrange to come to Spo-
kane about the time I arrive home from California, which will
be about January 5th or not later than the 7th, and we can
get together and I think without any difficulty dispose of the
remaining bonds . . . it is my honest opinion that it is
the best thing to do, because if these people are going to
stand over us with a club we cannot afford to risk too large
an investment, and as you are aware they are a power in
Sandpoint."

On December 20th the respondent wrote the appellant,
acknowledging the receipt of the letter from which we have
just quoted, and said:

"It goes without saying if the Humbird people go into
competition with us that they can do us serious damage. But

the worst bit of luck is that I have failed, after all, to make
my sale on the National Barium . . . I am exerting every
effort to sell the light bonds on this market, but it seems it
is of no use, . . . Our only prospect or chance of market-
ing these bonds is in the west. . . . The thing to do now
is to try and save as much as we can for ourselves. *Lose no
time in getting at this.*" [The italics are ours.]

On December 22 the respondent paid the $16,000 note.
On December 29 the respondent wrote the appellant, saying:

"I am enclosing you a prospectus that I have drawn up
for the purpose of selling the bonds of the Pend d'Oreille
Electric Company. I send you a copy of this as a memo-
randum to aid you in giving out something to put before the
prospective buyers of these bonds in the west. I am acting
on your suggestion in the matter. If the bonds were entirely
secure I would not object to holding them myself, but I can-
not afford to have so much money tied up in anything that
is open to attack."

The respondent sold the stock and bonds of the Pend
d'Oreille company in March, 1909.

The court instructed the jury:

"The so-called option agreement in evidence dated October
11, 1905, would not, of itself, make plaintiff the owner of the
stock therein described, but before plaintiff would become such
owner, he must perform the conditions named in said agree-
ment. If plaintiff failed to perform said conditions, then
he would not be the owner of said stock, and if you find that
plaintiff claimed no stock in said company other than such
as described in such agreement, then plaintiff, not being the
owner of any of such stock, could not recover in this action,
and your verdict would be for defendant."

This instruction presents the first question. In criticising
it, it is said that the statement, that if the appellant failed
to perform the conditions named in the instrument he would
not be the owner of the stock, is an obvious misconception
"of the facts of the case," and that "the sale of the bonds
was to be a condition of the *division,* not of their ownership."
(The italics are taken from the brief.) We think the instruc-

tion is a correct interpretation of the writing. It recites that the respondent purchased the plant from the Sandpoint company; that he sold it to the Pend d'Oreille company for a consideration of $79,960, represented by 4,996 shares of the capital stock of the latter company and $30,000 of its first mortgage bonds; that he has sold 9,000 of the bonds to Rutherford, and 5,000 of the bonds and 500 shares of stock to Farmin for $5,000; that he "owns and holds" 4,500 shares of stock and $16,000 of the bonds; that he borrowed $16,000 for the purpose of carrying the bonds until they could be sold; that in consideration of past services and the payment to him by the appellant of one-half of the amount of the $16,000 of bonds still unsold plus one-half the interest on the note, the respondent would assign him "one-half of any stock remaining in my name," after giving a bonus of stock of the par value of $500 with each $500 bond sold. It is needless to pursue the inquiry further, for if the instrument is ambiguous as to the appellant's rights, its terms are made clear by his testimony. He testified, that the bonds were issued to and belonged to respondent; that the respondent took the position, "and I presume justly so," that the appellant was entitled to take half of these bonds by paying him $8,000 within a certain time; that he was not entitled to any stock until he had disposed of his part of the bonds; that the agreement was that, if the appellant would sell half the bonds at any time within six months, he should have one-half of the stock that had not been disposed of; that he was not entitled to any stock for selling the $5,000 bonds to Mr. Farmin, and that he intended to "earn" the interest in the stock. He further testified:

"Under the original arrangement [meaning the writing of October 11] I was to sell one-half of $16,000 worth of bonds in order to earn a half interest in 2,900 shares of stock that would be left. In other words, that 2,900 shares of stock would represent the interest to me that Mr. Drumheller and myself would acquire."

The respondent testified to the same effect. It is obvious that a purchase or a sale of the bonds by the appellant was made a condition precedent to his ownership of any part of the stock. The instrument is ambiguous as to the duty of the respondent, but the testimony of the parties makes it clear that he was to assign to the appellant a one-half interest in 2,900 shares of stock upon the performance by the appellant of the conditions of the instrument.

The court also instructed:

"On the other hand, I instruct you that defendant would have no right against the consent of plaintiff to do anything which would prevent plaintiff from performing the conditions of said option agreement by which he might earn stock. And if you find that defendant, against the consent of the plaintiff, prevented plaintiff from performing the conditions of said agreement, and you also find that but for such prevention, plaintiff would have performed such conditions, and would in reasonable probability have earned such stock, then you should find for plaintiff on the question of ownership of stock. But you must also bear in mind that plaintiff may consent to any act on the part of defendant which would have the effect of interfering with or preventing plaintiff from performing the conditions of said agreement; and hence, if you find that defendant said or did anything which had the effect to make plaintiff cease trying for a time to perform the conditions of said agreement under which he might earn stock and plaintiff made no objection thereto but consented to such words or acts of defendant, then the situation would not be changed by such acts or words of defendant, for plaintiff has the right to consent thereto, and even if plaintiff for such reason failed to comply with such conditions, he should not be entitled to any of such stock. So, likewise, plaintiff may relinquish any rights he may have under such agreement by express refusal to claim any further rights thereunder. Hence if you find that plaintiff surrendered his rights thereunder and refused to do anything further therewith, then he would thereby forfeit all rights and would not be entitled to any of said stock."

In criticism of this instruction it is said that the instrument of October 11 is not an "option." The word "option,"

in its broadest sense, means the right to choose between one of two or more alternatives. 29 Cyc. 1502. The instrument is an option in that it gives the appellant the privilege of doing or not doing a particular thing, and imposes no duty or obligation upon him to do any of the acts mentioned. However, if the instrument is not technically an option, it points out certain things which the appellant is required to do before he can become the owner of any part of the stock. It is true, as the appellant argues, that the bonds were for sale; but it is equally true that the respondent owned both the stock and the bonds, and that the appellant could only acquire an interest in the stock by performing the conditions named in the instrument, unless he was prevented from earning it by the conduct of the respondent. This matter is covered by the instruction.

The court instructed the jury, in substance, that the parties had the right to terminate the "option" agreement by some other agreement touching the subject-matter; that if it was agreed that the respondent should retain the bonds together with the stock bonus for his private investment and that he did so retain them, and that if it was agreed that the stock remaining after deducting the stock taken by the respondent as a bonus should be equally divided between them, that would terminate the option, and the respondent would have no right against the consent of the appellant to change the new agreement.

"And if you find that such an agreement was made and performed, then plaintiff would thereby become the owner of one-half of the stock remaining after deducting the stock taken by defendant as a bonus with the bonds so purchased by him."

The appellant complains of this instruction. We think it correctly interprets one phase of the evidence.

The court permitted the respondent to put in evidence his letter of December 20, and permitted him to testify that, when he paid the $16,000 note, he did not intend to hold the

bonds as a permanent investment. This is assigned as error. It is well settled that, when the character of the transaction depends upon the intention of a party, he may testify what his intention was when he did the particular thing in controversy. The weight of such testimony is for the jury. 1 Wigmore, Evidence, § 581; *Kruse v. Seiffert & Weise Lumber Co.*, 108 Iowa 352, 79 N. W. 118; *McCormick Harvesting Mach. Co. v. Hiatt*, 4 Neb. (Unof.) 587, 95 N. W. 627; *State v. Kirby*, 62 Kan. 436, 63 Pac. 752; *Thurston v. Cornell*, 38 N. Y. 281; *Watkins v. Wallace*, 19 Mich. 56.

The letter of December 20 was competent evidence. It is true the appellant testified that he did not receive this letter. That fact goes to the weight of the evidence and not to its admissibility. The respondent testified, that it was properly addressed and mailed; that his return card with his address was placed upon the envelope, and that the letter was not returned. The legal presumption is that it reached the addressee. It was for the jury to determine from these facts whether the letter was received by the appellant. *Huntley v. Whittier*, 105 Mass. 391, 7 Am. Rep. 536; *Howard v. Daly*, 61 N. Y. 362, 19 Am. Rep. 285; *Melby v. Osborne*, 33 Minn. 492, 24 N. W. 253; *Scott v. Bailey*, 73 Vt. 49, 50 Atl. 557; *Starr v. Torrey*, 22 N. J. L. 190; *Oregon S. S. Co. v. Otis*, 100 N. Y. 446, 3 N. E. 485, 53 Am. Rep. 221; *Rosenthal v. Walker*, 111 U. S. 185.

It is argued that the corporation owned the bonds; that the respondent was only a pledgee; that he had gone security for the corporation in securing the $16,000 loan; that both the respondent and the appellant were the agents of the corporation for the sale of the bonds, and that the stock was held by the respondent "under the same condition as the bonds." The vice of these contentions is that they do not fit the facts. Under all the evidence, written and parol, the respondent was the owner of the stock and bonds. He had bought the plant, incorporated the Pend d'Oreille Company, and sold the plant to it, and had taken the stock and bonds

in payment. If one can own what he buys and pays for, the respondent owned all the stock and all the bonds except the portion that had been sold to Rutherford and Farmin. The fact that he borrowed the money and gave his note does not change the rule. There is no evidence and no inference tending to show that he borrowed the money for the corporation.

It is argued, however, that the respondent stated in his letter of November 25 that, if he paid the note, he would hold the bonds with the corresponding amount of stock bonus as a permanent investment, and that they would then divide the remaining stock—2,900 shares—equally and that, he having paid the note, the contract was complete and the appellant's rights fixed, and that evidence of a contrary intention was inadmissible. In support of this view, the appellant invokes the familiar rule that an acceptance before a notice of withdrawal is received is effective from the date it is placed in the mail, while a revocation or order of countermand is effective only from the time it is received. This is a sound rule, but it is not soundly applied. The respondent testified that he received the appellant's letter of December 14 on the 20th, advising that competition was threatened at Sandpoint; that the bonds were therefore not a desirable investment, and that he at once wrote and mailed the letter. Moreover, the appellant does not rely upon the respondent's letter of November 25. He must have known, when he wrote the letter of December 14, that the respondent would not, in the light of the disquieting information, hold the bonds as a permanent investment. He testified that he intended to discourage him from doing so. He further testified that the respondent told him, when he returned to Spokane early in January, that he had decided to hold the bonds as an investment, and that he relied upon that statement and rested his right to a recovery upon it. He said:

"I told him that I would refer him to our conversations in January, 1906, in which he agreed that he would take the bonds and he would carry them; that the only consideration

that he would ask of me was that I would pool my interest with him and let ·it remain in him until he had finally succeeded in making a deal with Humbird to get Mr. Humbird out of his way. I told him that I proposed to stand on that and that I did not propose to do anything else."

If the appellant's contention is sound, that the payment of the note together with the respondent's letter of November 25 constituted an irrevocable election by the respondent to hold the bonds as a private investment, he was entitled to a directed verdict. This view would result in making for the parties a contract which neither of them intended to make. In this connection, it seems not improper to say that the jury, in answer to interrogatory 4: "Did the plaintiff, after the expiration of the option agreement, ever say to the defendant that he, the plaintiff, claimed no further interest in said Pend d'Oreille Electric Co.?" answered: "Yes." The other assignments are highly technical, and require no separate consideration.

The judgment is affirmed.

DUNBAR, C. J., CROW, CHADWICK, and PARKER, JJ., concur.