No. 22,355.

THE STATE OF KANSAS, *Appellee*, v. PETER CRIQUI, *Appellant*.

### SYLLABUS BY THE COURT.

VENUE—*Mortal Wound Given in One County—Death Ensuing in Another—Jurisdiction in Either County*. The statute providing that if any mortal wound is given, or poison administered, in one county, and death by means thereof ensues in another, the jurisdiction is in either county, does not contravene section 10 of the bill of rights, providing for trial by a jury of the county or district in which the offense is alleged to have been committed.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed December 6, 1919. Affirmed.

*G. A. Stultz, J. B. Bryant,* both of Wichita, and *A. B. Crum,* of Lyndon, for the appellant.

*Richard J. Hopkins,* attorney-general, *James A. Conly,* county attorney, and *S. B. Amidon,* of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant appeals from the judgment pronounced on a verdict of guilty of manslaughter.

The mortal wounds were inflicted on the body of John W. Jones, on December 11, 1917, in Osage county. Some four days later, Jones was removed to his home in Sedgwick county, where he languished until July 27, 1918, when he died. The information was filed, the trial occurred, and the judgment was rendered in Sedgwick county. The statute under which the prosecution was conducted reads as follows:

"If any mortal wound is given, or poison administered, in one county, and death by means thereof ensues in another, the jurisdiction is in either county." (Gen. Stat. 1915, § 7938.)

Section 10 of the bill of rights reads as follows:

"In all prosecutions, the accused shall be allowed to appear and defend in person or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or

district in which the offense is alleged to have been committed. No person shall be a witness against himself, or be twice put in jeopardy for the same offense." (Gen. Stat. 1915, § 114.)

The contention of the defendant is that the offense was committed in the county in which the mortal wounds were given, and that the legislature lacked power to vest jurisdiction in the district court of another county, because of the provision of the constitution.

At an early day in England, whence our criminal jurisprudence was derived, the locality of a crime determined venue, for reasons depending chiefly on organization of the judicial machinery. This machinery became inadequate to deal with crimes of equivocal locality, as those in which the mortal blow was struck in one county and the victim died in another. Considerable confusion resulted, which was finally composed by statute. Sages of the common law differ as to the prevailing opinion before enactment of the statutes. Blackstone says:

"The grand jury are sworn to inquire, only for the body of the county, *pro corpore comitatus;* and therefore they cannot regularly enquire of a fact done out of that county for which they are sworn, unless particularly enabled by act of parliament. And to so high a nicety was this matter anciently carried, that where a man was wounded in one county, and died in another, the offender was at common law indictable in neither, because no complete act of felony was done in any one of them; . . ." (4 Blackstone's Comm. 303.)

East says:

"Regularly by the common law in this as in other matters of criminal jurisprudence the offence must be inquired of and tried in the same county in which it was committed. . . .

"Where the stroke and death are in different counties, it was doubtful at common law whether the offender could be indicted at all, the offence not being complete in either; though the more common opinion was, that he might be indicted where the stroke was given; for that alone is the act of the party, and the death is but a consequence, and might be found though in another county: and the body was removed into the county where the stroke was given." (1 East's Cr. L. 361.)

Lord Hale says:

"To make up the crime of homicide or murder there must be these three concurring circumstances:

"1. The party must be killed. Anciently indeed a barbarous assault with an intent to murder, so that the party was left for dead, but yet recovered again, was adjudged murder and petit treason, but that holds

not now, for the stroke without the death of the party stricken, nor the death without the stroke or other violence makes not the homicide or murder, for the death consummates the crime.

"It remains therefore to be considered, to what intents the offense of murder or manslaughter relates to the stroke or other cause of the death, and to what purposes it relates to the death only.

. . . . . . . . . . .

"At common law, if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either, but the more common opinion was, that he might be indicted where the stroke was given, for the death is but a consequent, and might be found. tho in another county, and if the party died in another county, the body was removed into the county, where the stroke was given, for the coroner to take an inquest *super visum corporis*." (1 Hale's P. C. 425, 426.)

Hawkins says:

"It is said by some, that the death of one who died in one county of the wound given in another, was not indictable at all at common law, because the offence was not complete in either county, and the jury could enquire only of what happened in their own county. But it hath been holden by others, that if the corpse were carried into the county where the stroke was given, the whole might be enquired of by a jury of the same county; . . . (1 Hawkins P. C. 94.)

"But of whatsoever nature an offence indicted may be, whether local or transitory, as seditious words, or battery, &c., it seems to be agreed, that if upon 'not guilty' pleaded it shall appear, that it was committed in a county different from that in which the indictment was found, the defendant shall be acquitted, as shall be shewn more at large in the chapter concerning Evidence.

"And therefore at the common law, if a man had died in one county of a stroke received in another, it seems to have been the more general opinion, that regularly the homicide was indictable in neither of them, bcause the offence was not complete in either, and no grand jury could inquire what happened out of their own county." (2 Hawkins', P. C. 301.)

The view expressed by Hawkins appears to have been held by parliament when it dealt with the subject by the act of 2 and 3 Edward VI, chapter 24, passed in 1547. A portion of the preamble and a portion of the body of the act read as follows:

"Forasmuch as the most necessary office and duty of the law is to preserve and save the. life of man, and condignly to punish such persons that unlawfully and wilfully murder, slay or destroy men, and also that another office and duty of law is to punish robbers and thieves, which daily endeavour themselves to rob and steal, or give assistance to the same, and yet by craft and cautele do escape from the same without punishment:

The State v. Criqui.

"And where it often happeneth and cometh in ure in sundry counties of this realm, that a man is feloniously stricken in one county, and after dieth in another county, in which case it hath not been founden by the laws or customs of this realm, that any sufficient indictment thereof can be taken in any of the said two counties, for that that by the custom of this realm the jurors of the county where such party died of such stroke, can take no knowledge of the said stroke being in a foreign county, although the same two counties and places adjoin very near together; ne the jurors of the county where the stroke was given cannot take knowledge of the death in another county, although such death must apparently come of the same stroke: So that the King's majesty within his own realm cannot, by any laws yet made or known, punish such murderers or manquellers, for offences in this form committed and done.

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"For redress and punishment of which offences, and safeguard of man's life, be it enacted by the authority of this present parliament, That where any person or persons hereafter shall be feloniously stricken or poisoned in one county, and die of the same stroke or poisoning in another county, that then an indictment thereof founden by jurors of the county where the death shall happen, whether it shall be founden before the coroner upon the sight of such dead body, or before the justices of the peace, or other justices or commissioners which shall have authority to enquire of such offences, shall be as good and effectual in the law, as if the stroke or poisoning had been committed and done in the same county where the party shall die, or where such indictment shall be so founden; any law or usage to the contrary notwithstanding." (5 Statutes at Large, 320, 321.)

The realism of this statute is very refreshing. Hot debate about which one of two feet the crime stood on, the one in the county of wounding, or the one in the county of death, might go on, as it has gone on ever since, but the crime was made indictable and triable in the county of death, and to that extent was given practical locality, for the purpose of curing paralysis of the power of the criminal law.

The statute of Edward VI was in force in the fourth year of James I and, being a statute of a general nature, is regarded as a part of the common law which accompanied the colonists to this country, and became a part of our common jurisprudence.   (See, *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571.)

It is elementary that the constitution is to be interpreted in the light of the common law.   (12 C. J. 718.)

"It is also a very reasonable rule that a state constitution shall be understood and construed in the light and by the assistance of the com-

mon law, and with the fact in view that its rules are still left in force. By this we do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common-law rules, but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the beginning of law for the state, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes. . . ." (Cooley Const. Lim., 7th ed., p. 94.)

Section 10 of the bill of rights is virtually a transcript from authenticated English guaranties of personal liberty and security, and cannot be understood without understanding the common law. The section embraces several subjects, all of them relating to prosecution for crime. It does not, however, make any declaration concerning venue. The entire section assumes a prosecution already begun. There is a provision for public trial by an impartial jury. Composition of the jury, not venue of the prosecution, is then stated—"jury of the county or district in which the offense is alleged to have been committed." The distinction is made clear by stating the provision in terms of venue, reinforced by italics—trial . . . *in* the county in which the offense *was committed*. It is true the limitation respecting locality from which the jury must come operates indirectly as a limitation on venue. A pleading alleging the county in which the offense was committed is contemplated, and the jury must come from that county; but there is nothing in the section indicating what allegation of place where the crime was committed will be sufficient to identify the county from which the jury must be drawn. The result is, the true extent of the limitation must be ascertained by an examination of the common law. Turning to the common law, we find that regularly the offense must be tried in the same county in which it was committed; but the practice had been established of prosecuting in the county where death occurred, if the blow were struck in another county.

There can be no doubt that it was not the purpose of the bill of rights to place the subject under consideration where it was when the preamble to the statute of Edward VI was framed. Broadly considered, that statute established the principle that a crime, the locality of which is ambiguous because action and consequence occurred in different counties, shall be prosecuted

in one of them, and designated which one.  The people were perfectly familiar with the principle when the constitution was framed and adopted.  The territorial code of criminal procedure contained a number of sections applying the principle to various offenses.  One of the sections was in the exact language of the present statute (Laws 1859, ch. XXVII, § 23).  The bill of rights made no choice respecting venue between the county in which mortal wound was given, or poison administered, and the county of ensuing death, and it was competent for the legislature to vest sole jurisdiction in one or the other, or to vest jurisdiction in either.

The decision in the case of *The State v. Bowen,* 16 Kan. 475, is cited as opposed to the conclusion just announced.  The syllabus states what was decided:

"An information for murder is sufficient which charges the giving of the fatal blow in the county in which the prosecution is had, and the fact of ensuing death, although it failed to allege specifically in what county or state the death took place."  (Syl. ¶ 4.)

In the opinion it was said:

"There has been much confusion and conflict as to the jurisdiction and power to punish in cases in which the fatal blow is given in one county or state, and death ensues in another county or state.  So far as counties are concerned, the statute settles all question."  (p. 478.)

Therefore, the decision is not in conflict with the views which have been expressed.

In the opinion in the Bowen case, an information filed in the county where the fatal blow was struck was justified as follows:

"It seems to us, without pursuing the authorities further, reasonable to hold that as the only act which the defendant does toward causing the death is in giving the fatal blow, the place where he does that is the place where *he commits the crime,* and that the subsequent wanderings of the injured party, uninfluenced by the defendant, do not give an ambulatory character to the crime; at least, that those movements do not, unless under express warrant of the statute, change the place of offense; and that while it may be true that the crime is not completed until death, yet that the death simply determines the character of the crime committed in giving the blow, and refers back to and qualifies that act."  (p. 479.)

If an information filed in the county where death occurred were under consideration, it might be justified, aside from the statute, briefly as follows:

46—105 KAN.

"The stroke without the death of the party stricken, nor the death without the stroke or other violence makes not the homicide or murder, for the death consummates the crime." (1 Hale's P. C. 425.)

"It is the nature and the right of every man to move about at his pleasure, except so far as restrained by law; and whoever gives him a mortal blow assumes the risk of this, and in the view of the law, as in that of morals, takes his life wherever he happens to die of that wound." (*Commonwealth v. Macloon & others*, 101 Mass. 1, 20.)

Philosophizing over the subject, Where is a crime committed which involves two places? may continue, as debate over the subject, Which is entitled to precedence, the egg or the hen? may continue; but, at every stage, the argument must confront the fact that the crime was actually located, for the purpose of punishment, almost three and three-quarter centuries ago. In this state it is now located by valid act of the legislature.

A dying declaration was read to the jury. It is urged that the declaration was not made under a sense of impending death. It is not necessary to review the evidence on the subject. The evidence is sufficient to show the declaration was made under proper sanction.

The judgment of the district court is affirmed.