No. 29,993.

THE STATE OF KANSAS, *Appellee*, v. C. C. KEESTER, *Appellant*.

(4 P. 2d 679.)

Opinion
filed November 7, 1931.

*John W. Adams,* of Wichita, and *W. T. McBride,* of Wellington, for the appellant.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, *Bert E. Church,* county attorney, and *E. J. Taggart,* of Wellington, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of manslaughter in the first degree, and appeals. The death was the result of an abortion.

Defendant testified he was a physician and surgeon who had been practicing in Wichita since 1894. He admitted coroners' juries had twice found him guilty of death of girls caused by abortions he had performed. He was twice tried for manslaughter committed by means of abortion. In one case he was acquitted. In the other he was convicted of first-degree manslaughter, but the judgment was reversed because he was only charged with second-degree manslaughter. (*State v. Keester,* 121 Kan. 167, 246 Pac. 685.) The abortion charged was performed in January, 1930. In his opening statement to the jury the county attorney said defendant killed a named girl seventeen years old by committing an abortion on her in February, 1930. The court, contrary to the best authority (1 Wigmore on Evidence, 2d ed., § 359; 1 C. J. 329), and the rule of this court (*State v. Caton,* post, p. 136), directed the jury to disregard statements concerning subsequent acts, and no evidence of other abortions was offered.

On Monday, January 6, 1930, a young man and a girl seventeen years old went from Wellington to Wichita. They went to Wichita to see a doctor, and they knew to what doctor's office they were going. In Wichita they looked in a telephone directory to find defendant's office address, and found it. They then went to defendant's office and consulted him. Defendant was told the young woman was in a family way, and would like to have an operation to get rid of the condition. Defendant asked if she was ready, and

she said she was. Defendant placed her in a chair that tipped back so she lay flat, removed her bloomers, and examined her. After the examination he got some instruments which he used on the girl. The young man stood at the girl's head and saw all that was done. After the operation defendant helped the girl from the chair, explained what the result would be, and recommended that she and the young man stay at a hotel half a block away, where defendant had patients. The young man paid defendant $40 in cash, and he and the girl went to the hotel. They registered as man and wife, and were assigned to a room, which they occupied together. On Wednesday the young man saw defendant and reported the girl was doing fine. On Thursday a consequence of the operation was checked, and the young man sought defendant, but could not find him. On Friday evening the young man found defendant, and about 7:30 p. m. defendant went to the hotel, visited the girl, and examined her. She was in bed, and defendant said if she were left in the condition she was in she would probably die. The young man was directed to get a fountain syringe, which he did. The doctor took instruments from his bag, used them on the girl without sterilizing them, and used the fountain syringe. The young man was present and saw what was done. On Saturday the girl's condition was improved. On Sunday afternoon about 2:30 o'clock defendant visited her at the hotel, and said she could go home. On Sunday evening the young man took the girl to his mother's home in Wellington, and told his mother what the trouble was. On Monday the girl became very sick. The young man told the girl's sister what had occurred, and Doctor McGrew was called. Doctor McGrew was given the history of the case, and made an examination. He recommended that the girl be taken to a hospital, and on the morning of Tuesday, January 14, she was admitted to St. Luke's hospital in Wellington. She was then suffering from peritonitis caused by infection of the uterus consequent upon the abortion produced by defendant. On January 23 Doctor Van Deventer was called, and he, with Doctor McGrew, made an examination of the girl. She was in a very dangerous condition, and Doctor Snyder was called in consultation. On January 31 Doctor Snyder performed an operation in an effort to save the girl's life, and her condition was very bad until death occurred. On February 4 she was given a blood transfusion. In the evening of February 5 or 6 the girl asked her stepmother to send other persons from the room.

When this was done she said, "Mother, I am going to die. What Doctor Keester did to me is going to kill me." She then told of being in a family way about two months, of the trip to Wichita, and of what defendant did. She said that she herself had done nothing and had taken no medicine to cause the abortion. About February 12 she became irrational, and on February 28 she died.

The defense was the stock defense of the practitioner of abortion —the girl did it herself, and then went to a doctor for help.

Defendant testified the young man came into his office alone, said he had a very sick wife down in his car, and said he wanted the doctor to see her immediately. Defendant was standing in the door between his reception room and private room, and told the young man there were patients ahead of him, but if they had no objections to bring her up. The young man gave his name, and said he was from Ponca City. The young man departed, and presently came back with the girl. There were three men and an office girl in the reception room. In the reception room, in the presence of the men, the young man said: "This is my wife. Examine her, and see what is the matter with her." The young man sat down back of the door. The girl went into the private room, and defendant left the door open. With the door open so every one could hear what she said, defendant asked her what the trouble was. She said she thought she was pregnant; she had treated herself, and she had made a bad mistake. Defendant then asked her name and where she was from. She answered, and defendant said: "This man told me you were his wife, and said he was from Ponca City. . . . Your story don't jibe." Defendant was suspicious, and said to the girl he couldn't do anything for her. The girl got up, walked out, and defendant never saw her again. Defendant admitted he made an examination of the girl to this extent: He took her pulse, which was 128, and her temperature was 102. He said that in cases of that kind he didn't care what became of them, and said: "I have been accused of taking those kind of cases, until now I don't have anything to do with them."

Two of the men sitting in the reception room testified they heard the doctor say, "I can't do anything for you." The office girl testified that when the girl came out of the private office, she asked if there was any other doctor in the building. The office girl said she knew of none. The girl then said, "I fear I have made a serious mistake, and the doctor has refused to do anything for me whatever."

One of the men sitting in the reception room testified the girl said, "The doctor refused to take my case, and I think I have made a sad mistake." This man testified, however, that the private office door was closed while the girl was in there, an important bit of testimony not abstracted by defendant. Of course, decent doctors do not make virtually public examinations of their women patients. In answer to the question whether it was his custom when receiving patients to leave the door open, defendant said, "I did it that time."

If the foregoing testimony for defendant were believed, it was incompatible with defendant's guilt. The girl broadcast her own condition, as the result of her own act, and defendant's refusal to treat her. The jury did not believe the testimony, and that they did not arbitrarily reject the testimony will presently appear.

Defendant deemed it necessary to overcome the young man's testimony regarding the two visits to the hotel. So, defendant testified he was at home the entire evening of Friday, January 10. He knew because Friday, January 10, was his wife's birthday, and she had a birthday dinner that evening. Mrs. Keester testified Friday, January 10, was her birthday; she had a birthday dinner that evening; her husband was at home all the time after about 5 o'clock in the afternoon; she remembered distinctly they had dinner about 6, or a little later; it was her birthday dinner; they always tried to do something on her birthday, but this time they decided to spend the evening at home; Mrs. Woods and Mrs. Keester's sister were there. Mrs. Woods testified she had known Mrs. Keester for seven years; Mrs. Woods' birthday was January 9; Mrs. Keester's was January 10; in 1930 they celebrated their birthdays together, and had done so for five years; she arrived at Mrs. Keester's house about 3 or 4 in the afternoon, and stayed until 10 in the evening; defendant came from his office about 5 o'clock, and was not away from the house the entire evening. Mrs. Keester's sister testified she was at the birthday dinner on Friday evening, January 10; she knew positively that was Mrs. Keester's birthday, and Mrs. Woods was there. Mrs. Keester said nothing about a practice of celebrating her birthday with Mrs. Woods.

Defendant, his wife, and his wife's sister all testified with positiveness and particularity that they went to Belle Plaine on Sunday, January 12, and defendant was there all day; they knew because it was the Sunday following the birthday party. On cross-examination Mrs. Keester gave the birthdays of her several brothers and sisters.

In rebuttal the state produced incontrovertible record evidence that Mrs. Keester's birthday was January 28, and not January 10. The record consisted of returns to the county superintendent made by the district clerk of the school district in which Mrs. Keester attended school. The record showed the names, dates of birth, ages, and names of parents of children who attended school, for the years 1904, 1905, 1906 and 1908. According to the record Mrs. Keester correctly gave the birthdays of her brothers and sisters. There was no attempt to explain away the record evidence, and defendant did not choose to incorporate it in his abstract. The result was, defendant's house-of-cards defense fell, and the jury were fully warranted in believing, as they manifestly did, the young man's entire story.

The instruments which caused death were used in Sedgwick county. Death occurred in Sumner county. The information charged the crime as if cause and consequence both occurred in Sumner county, and used the phrase "then and there" eight times. Defendant contended in district court, and contends here, there was a variance between pleading and proof.

Authorities are cited to the effect that all ingredients of the crime must appear in the information. This is true. But neither time nor place was an ingredient of the crime charged. The crime was manslaughter, committed by killing a human being, without design to effect death, by using instruments in an effort and with intent to produce abortion. It was necessary that time should be alleged in the information solely because of the time limitation on prosecution; it was necessary that place should be alleged solely because of the venue limitation; but date and place of abortion, and date and place of death, were not facts constituting the offense.

No objection to the information was made in the district court, but authorities are cited to the effect that ingredients of an offense must be charged with reasonable certainty respecting time and place, so a defendant may prepare his defense. The code of criminal procedure of this state makes no such requirement, unless time and place are ingredients of the offense.

The hypertrophied certainty demanded by the common law served its purpose in a period when punishment was shockingly severe. It lingered to obstruct justice. Any time within the statute of limitations will suffice, unless time be an element of the offense, and unless place be an element of the offense place need not be

alleged, otherwise than for purpose of jurisdiction. There must be certainty with respect to the party and the offense charged. The facts constituting the offense must be clearly and concisely stated. But it is sufficient if the offense be alleged with such certainty the court may pronounce judgment according to the right of the case. (R. S. 62-1010, *Fifth.*)

"The code of criminal procedure was framed to supersede the common law with a more rational system. While it is defective in many respects, and in many others exhibits a conservatism which contrasts strongly with its general liberality, it is distinctively modern. The tradition of the common law, however, was so strong that it came near superseding the code. In time the code was rediscovered, and it is the purpose of the court to interpret and apply it according to its true intent and spirit." (*State v. Fleeman*, 102 Kan. 670, 677, 171 Pac. 618.)

When framing its model code of criminal procedure the American Law Institute virtually adopted the theory of the Kansas code and provided that an indictment or information need contain no allegation of time or place of commission of the offense unless necessary to charge the offense. (Am. Law Inst. Code Cr. Proc., §§ 158, 159.)

The subdivision of the criminal code relating to local jurisdiction of offenses contains the following provisions:

"When a public offense has been committed, partly in one county and partly in another, or the act or effects constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." (R. S. 62-404.)

"When property taken in one county by burglary, robbery, larceny or embezzlement has been brought into another county, the jurisdiction is in either county." (R. S. 62-407.)

"When property taken in any other state, territory, or county by burglary, robbery, larceny or embezzlement shall have been brought into this state, the jurisdiction is in any county into or through which such property shall have been brought." (R. S. 62-408.)

"An accessory before or after the fact may be punished in the county where he committed the offense, or in the county where the principal offense was committed." (R. S. 62-409.)

"If any mortal wound is given, or poison administered, in one county, and death by means thereof ensues in another, the jurisdiction is in either county." (R. S. 62-410.)

Authorities are cited to the effect such statutes do not abrogate the rules of criminal pleading. This may be conceded. They locate public offenses involving two or more places for purpose of prosecution and punishment. (*State v. Criqui*, 105 Kan. 716, 185 Pac.

1063.) In order to disclose jurisdiction, the information may charge commission of the offense in either locality, as was done in this case:

"In the county of Sumner and state of Kansas, one C. C. Keester did then and there unlawfully, willfully and feloniously, and without design to effect death, kill one certain human being, to wit: [naming the victim], by the act of him, the said C. C. Keester, to wit, . . ."

Certainty of the charge respecting the act is governed by rules already stated. As indicated, the act consisted in using instruments on the body and womb of the girl, in the perpetration of or attempt to perpetrate abortion, with intent to commit abortion. The county where the instruments were employed was not a constituent of the act. When the act was proved, the place where it was done came out as a detail of evidence; but there was no variance between pleading and proof of the necessary elements of the offense charged.

The relation of one of the statutes quoted above to the subject of pleading has been determined by this court. In the case of *The State v. Wade,* 55 Kan. 693, 41 Pac. 951 (1895), it appeared that Wade was charged by information in the district court of Wilson county with larceny of cattle in Wilson county. The proof showed the stealing occurred in Elk county. The syllabus reads:

"Where property is stolen in one county and taken by the thief into another, he may be charged in the latter county with the larceny therein, without stating the place of the original taking."

The opinion rested the decision on the common-law view that each asportation is regarded as a fresh theft. This was, of course, pure fiction, and the common law delighted in fictions. The fact was, the theft occurred in Elk county, and nowhere else. However attenuated the reason given for the decision, it established the principle that when property is stolen in one county, and is taken by the thief to another, he may be charged with larceny in the latter without stating the place of original taking. This is necessarily true of burglary, robbery and embezzlement named in the same statute, and the court holds the principle applies generally to offenses involving two places, except when place is an ingredient of the offense.

The mode of pleading does not expose defendant to double jeopardy. The gravamen of the offense was homicide—the killing of a named human being (*State v. Wheaton,* 79 Kan. 521, 523). Having been convicted of killing that person once in one place, it is not likely he will be convicted of killing her again in another place.

As indicated, the information was meticulous in using the phrase

"then and there," and the question remains whether defendant was led to believe he was charged with doing the act in Sumner county, and consequently was bewildered by proof it was done in Sedgwick county. To state the question is to answer it. The record shows defendant had a preliminary examination at which the young man testified, after he had been promised immunity from prosecution.

Defendant complains that medical opinion respecting cause of the girl's condition was based partly on a history of the case given by the girl.

When Doctor McGrew was called as a witness he testified he made an examination of the girl at her home, and obtained a history of the case from her. She also gave him the history of the case at the hospital the next day. Seemingly, the following then occurred:

"Q. When you got this history of the case, had you formed any opinion yourself as to what this girl was suffering of? A. Yes, sir.

"Q. Did the history of that case bear that out? A. Yes, sir.

"Q. All I want to know is whether you got a history of the case, and whether or not you said that history coincided with your findings. A. Yes, sir.

"Q. Was the history of this case given you the same as your findings from your examination? A. Yes, sir."

The questions and answers were objected to. Whether history and opinion coincided was a conclusion, but no harm had been done, because neither history nor opinion had been disclosed.

The abstract and the counter abstract then show that Doctor McGrew testified a doctor must bring in the history of a case to make diagnosis, that doctors arrive at conclusions from history of cases, and that he based his conclusion the infection found in his patient's abdomen came from a previous operation, on the history and what he found, jointly.

It has been noted Doctor McGrew testified that when he got the history of the case he had himself formed an opinion respecting what the trouble was. He testified he felt it was the direct result of an abortion. He further testified that outside the history of the case he could form an opinion, although he might be mistaken in some respects; that from his own knowledge he felt he knew what had been done; and that from his examination the patient was suffering from abortion. Doctor McGrew also testified:

"I gave the anesthetic at the time Doctor Snyder operated upon her, and I saw the operation performed. When the incision was made he found the

abdomen full of abscesses. There was but one conclusion to draw, and that was the infection came from a previous operation. We believed that condition was produced by a curettement she had had as the result of an operation for abortion.

"Q. It was your opinion that the condition you found in [the patient] was the result of an operation performed by somebody? A. That was our conclusion. After her death, a post-mortem examination was made of her body. I had no reason, after making the post-mortem examination, to change my view."

Afterwards, when Doctor McGrew was under cross-examination by defendant, the doctor offered to read and, without any objection whatever by defendant, did read the full history of the case obtained from the girl, which included pregnancy, going to Wichita, operation by defendant in his office, consequences of the operation, defendant's visit to the hotel, and other matters. The witness then testified:

"Q. Is that a fact, now? A. Yes, that is a fact, but I wish to make it plain that the physical examination made very evident what was wrong with the girl."

The result of the foregoing is, Doctor McGrew had an opinion at the beginning respecting cause of the girl's condition—it was a case of abortion. He obtained a history of the case. On the basis of what he himself discovered, and the history, he had an opinion the case was one of abortion. Without regard to the history the observed physical facts demonstrated the case was one of abortion. Defendant was responsible for the reading in evidence of the history of the case, which was the history of an abortion case. The doctor still made it plain the physical examination demonstrated abortion. Therefore, it was not of the slightest consequence that, in the course of his examination as a witness, the doctor said he based an opinion on history and examination jointly, and it was not of the slightest consequence that he said the history coincided with his own findings.

Doctor Van Deventer testified he made an examination with Doctor McGrew; he listened to Doctor McGrew's history of the case, and made an examination. From the history and the examination, Doctor Van Deventer was of the opinion the patient had probably had an abortion. Aside from Doctor Van Deventer's opinion, the evidence of abortion consisted of the testimony of the young man who saw the abortion produced; the girl's statements that de-defendant performed the abortion; Doctor McGrew's testimony,

independently of history, that there had been abortion; and the dying declaration that there had been an abortion. Therefore, Doctor Van Deventer's testimony was not prejudicial. (*Smith v. Railroad Co.*, 95 Kan. 451, 148 Pac. 759; *Hill v. Railroad Co.*, 113 Kan. 489, 215 Pac. 310.)

Defendant contends there was no evidence of pregnancy, an essential ingredient of the offense. There was medical testimony regarding uncertainty of existence of pregnancy in the early stages. On cross-examination by defendant, Doctor McGrew said the only way to tell, before life starts, is by examination by a doctor. In this instance the girl told defendant she was in a family way. Defendant then examined her. Then he operated. Besides that, her various statements that she was pregnant were evidence of pregnancy:

"The declarations of the deceased woman to defendant and others are admissible to establish the fact that she was pregnant." (1 C. J. 325, and cases cited, p. 326, note 12.)

The dying declaration was clearly admissible. Its credibility and weight were matters for the jury to determine. Instructions requested by defendant discounting the weight to be given the dying declaration did not state the law. The direct and positive testimony was amply sufficient to warrant a verdict of guilty, and the case was not one requiring an instruction on circumstantial evidence. Other instructions requested by defendant were properly refused. Assignments of error not discussed have been considered, and are without merit.

The judgment of the district court is affirmed.