No. 44,336

STATE OF KANSAS, *Appellee*, v. RAYMOND L. DARLING, *Appellant*.

(419 P. 2d 836)

Opinion filed November 5, 1966.

*Russell Shultz*, of Wichita, argued the cause, and *Richard L. Ebersole* and *Larry Kirby*, both of Wichita, were with him on the brief for the appellant.

*Donald L. Allegrucci*, Deputy County Attorney, argued the cause, and *Robert C. Londerholm*, Attorney General, and *Roy S. Fischbeck*, County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action in which the defendant was charged with employing an instrument with intent to procure an abortion or miscarriage of a pregnant woman on the 30th day of August, 1963, as denounced in K. S. A. 21-437. The case was tried to a jury and upon conviction appeal has been duly perfected.

Specifications of error assigned on appeal all relate to the admissibility of evidence at the trial.

The state by its evidence sought to prove that the appellant wilfully and unlawfully used an electronic device upon a certain pregnant woman, hereafter referred to as Mrs. A, with the intent to procure an abortion or miscarriage, the same not having been necessary to preserve the life of such woman.

The state's evidence disclosed that by reason of an electronic device used upon Mrs. A by the appellant she did abort within two days following the use of such electronic device.

The appellant, who is a chiropractor, defended on the theory that his particular specialty was amenorrhea and gynecology; that all he did was perform an amenorrhea for delayed menstrual periods, which required that pregnancy first be ruled out; that to rule out pregnancy, he required a Friedman laboratory test which showed negative results. He testified in his defense that the results of the laboratory test upon the urine which Mrs. A submitted was reported to him as negative, by reason of which he put her "on the table and proceeded to use the amenorrhea treatment as in the Kovak's Electric Therapy Book. It is electric therapy, light therapy, it is a text book we use in physical therapy." The appellant also testified the machine was "a low voltage generator that is called fine galvanic generator Teca machine."

Mrs. A testified that on the 30th day of August, 1963, she was three months pregnant (this fact was confirmed by the testimony of a physician whom she had been consulting prior to this date) and went to the appellant to see if he would perform an abortion upon her. She testified:

". . . I told him I was pregnant and I did not want to go through it. I made up my mind and I had heard from different sources he would perform this for me for a certain fee and I can't tell exactly what he told me, but he made me understand he thought he knew what he was doing and I was satisfied as to what he was doing. Before I left I asked him his fee and he replied $120.00. . . ."

The appellant told Mrs. A she would have to be tested to see whether or not she was pregnant before he would touch her. He told her she would have to have a urinal specimen and Mrs. A understood the appellant would not do anything about it unless she had a negative pregnancy test.

He directed her to take a urine specimen to a laboratory in Wichita at an address which the appellant gave to her. She complied and presented a urine specimen to a girl at the laboratory in Wichita and told her the purpose for which it was being submitted. The charge was $10.

She went back to the appellant's office in El Dorado the same day, and the appellant informed Mrs. A that he had received the results of her test and was glad to see that she was not pregnant. She testified:

". . . He informed me that the test showed I was not pregnant. I didn't reply anything, maybe a grunt or something. The defendant did not say anything else. Then he says so we can proceed with this treatment. . . . After the conversation concerning the laboratory test, I disrobed and was then taken to this room where there was another machine. I completely disrobed but I was given a back open night gown. The defendant directed me to this room. I was alone when I disrobed and put the gown on. I was placed on this table with a weight. It seems like it was a weight and there was heat. He didn't say what this treatment was for. I knew that this treatment was for the purpose of an abortion. I was placed beside a small machine and he said he would be gone for a little bit and he directed me where the heat and where the temperature could be turned down some and he would be back in a little bit. I did not at any time have to regulate the machine. I only felt sensation from the application of the machine once. I felt heat. I don't know how long the defendant was out of the room, it could have been anywhere from 15 minutes to 30 or 35 minutes. During this treatment the defendant physically touched me. I think he opened the womb with a small instrument. It has come across my mind that he said 'I think we will get a little started.'

"This little arm on the machine was adjusted, it seemed like with weights, to come down over the uterus or right over part of the stomach. It was placed at that time right over the uterus. No other part of the machine or any attachments came directly in contact with my body . . ."

Over objections of the appellant the state placed an electronic device in evidence as Exhibit "1." In identifying Exhibit "1" Mrs. A testified the machine was similar to the one used; that it resembled wood but she knew it was not wood but merely resembled wood. She said "I am as near positive as I can be that this was the machine."

Mrs. A. testified that on the 1st day of September, 1963, as she was lying on the couch the water broke, and "the fetus and so forth started to pass." She needed medical attention and was hospitalized for a period of two days and placed in charge of a physician whom she had not previously consulted concerning her pregnancy.

The appellant specifies as error the admission of the state's Exhibit "1" into evidence. Counsel for the appellant concede that ordinarily instruments used to cause an abortion when found in the possession of a defendant may be introduced in evidence at the time of the trial; but they argue the machine, identified as Exhibit "1," according to the testimony of the physician Mrs. A first consulted regarding her pregnancy, was used in physical therapy departments in hospitals and doctors' offices on inflammatory reactions around normal adult tissues, such as bursitis, low back pain or lumbago. It is therefore argued Exhibit "1" is not an instrument which is *per se* designed for abortions, and inasmuch as there was expert testimony that the machine in question was capable of producing abortions, the state had the burden to show that this particular machine was the one which had been used upon Mrs. A.

The appellant cites the court to no authority for his proposition, and we fail to see merit in his argument. In *State v. Montgomery,* 175 Kan. 176, 261 P. 2d 1009, this court said:

". . . The books are full of cases holding that where an accused is identified as having been at or near the scene of a crime about the time of its commission evidence showing that he owned, possessed or had access to any articles with which the crime was or might have been committed is competent. . . . [citing cases.]" (p. 180.)

In *State v. Lentz,* 128 Kan. 314, 277 Pac. 794, the defendant was charged with burglary and larceny of men's clothing. Objection was made to the admission of evidence by the owner of the clothing concerning the type of hangers found in the defendant's possession, they being the same type taken with the clothing. The court said:

". . . It is argued that many such hangers were manufactured and sold throughout the country, and that the finding of some of that kind in defendant's possession did not constitute competent proof that they had been stolen from the store by the defendant. The type of hangers being unusual and not in common use in the community, the finding of such hangers in defendant's possession tended in a degree to connect defendant with the offense. Although not strong, the evidence cannot be regarded as being destitute of probative value. It was not improper to admit the evidence and leave to the jury the determination of the weight to which it was entitled when considered in connection with the other evidence in the case touching the identity of the things charged to have been stolen by the defendant." (p. 315.)

The record discloses the exhibit in question was seized by the sheriff of Butler County on February 10, 1965, pursuant to a search warrant which referred to "one diathermy machine or apparatus equipped with a felt or other type heating unit and any portable ultrasonic or diathermic heat producing unit."

We think the testimony of Mrs. A sufficiently identified the state's Exhibit "1" to permit its admission into evidence. The lapse of time between the offense and the seizing of the exhibit, coupled with the appellant's attempt to show that he did not purchase the machine identified as Exhibit "1" until after September 1, 1963, raised a question of fact for the jury to determine. The appellant's argument goes merely to the weight and not the admissibility of the evidence.

The state as part of its case in chief, over the appellant's objection, introduced evidence of other similar acts committed by the appellant subsequent to the offense for which he was on trial. One of these witnesses, a girl seventeen years of age at the time of trial, hereafter referred to as Miss X, testified that she was acquainted with the appellant; that she first saw him in February, 1964, in his office. She testified:

". . . My mom and dad were with me. He wanted to know why we came down and I wanted to know if he could help me, that I was pregnant and he said that he could. He told us to go to Wichita. To take a sample of urine to the medical center over there. We went to Wichita to the medical center. He directed my mother to take a sample of her urine to Wichita to prove she wasn't pregnant and to use it for mine."

After making the trip to the Wichita laboratory they returned to the appellant's office, and the treatment with the electronic device administered to Miss X, as described by her, was in nearly all material respects similar to that administered upon Mrs. A. The parents paid the appellant $125 in cash. They returned to their home with instructions from the appellant that if nothing happened as a result of the first treatment, given on a Friday, to return for a second treatment.

The following Tuesday Miss X and her parents returned to the appellant's office and a second treatment with the electronic device was administered, similar in all respects to the first one.

The following Wednesday Miss X testified as to events which in substance indicate that she aborted.

The record discloses the appellant was charged and tried for the offense concerning which Miss X testified, but the trial resulted in *an acquittal.*

Immediately after the testimony of Miss X the trial court orally admonished the jury concerning the limited purpose for which such evidence was admissible—that the evidence was to be received and considered by the jury "only for its value, if any, as to circumstances bearing upon the question of the defendant's intent, motive, knowledge, plan, or absence of mistake and accident."

The state also introduced the testimony of another young woman, hereafter referred to as Miss Y, who said she saw the appellant in his office in El Dorado about the 28th or 29th of July, 1964. Miss Y testified that she must have been going on five months pregnant, and that the appellant thought she was a little too far along, but advised her there were some people starting a clinic in Wichita, and he thought it would be better if she would wait to have them help her because it would not be as dangerous. He informed her that someone would be contacting her by "Thursday." (Apparently nothing developed—the record being silent as to any follow-up on this.)

About a week later she saw the appellant in his office. She testified:

". . . he said I should go to Wichita and have some tests taken before he went ahead and did it. He gave me the place to go. . . . I went to the laboratory the next day. The test was taken. It was a blood test and urine specimen. I stayed overnight in Wichita and he said the tests would be phoned back to him. I then returned to El Dorado.

"When I returned to El Dorado, I saw the defendant in his office. He said the tests were all right and if I was ready, he was ready. I went into a dressing room and put on a medical gown, then I went into this little room. The defendant had an instrument with cotton on it and that is when he broke the water bag. He brought this machine over to the place where I was lying. . . ."

Further testimony of Miss Y regarding the treatment administered by the electronic device was similar to that administered to Mrs. A. She testified the party who took her to the appellant paid him a fee of $300. Within a few days after she returned home she began getting severe cramps and went to a physician. She was later hospitalized, became quite ill, and aborted.

Following the testimony of Miss Y, the trial court gave the jury an oral instruction similar to that given after Miss X testified—as to the limited purpose for which such testimony could be received and considered.

The appellant specifies as error the admission of the testimony of Miss X and Miss Y in evidence.

The first argument on this point is that the alleged offenses concerning which these witnesses testified were subsequent to the crime charged—that of Miss X six months subsequent, and that of Miss Y almost one year subsequent. It is argued the acts in question had no bearing upon the offense charged to show the appellant's intent, knowledge, scheme or plan at the time of the alleged offense. (Citing *People v. Hobbs,* 297 Ill. 399, 130 N. E. 779; and *State v. Folsom,* 28 Wash. 2d 421, 183 P. 2d 510.)

The appellant also relies upon language in Kansas cases which speak of prior similar offenses or conduct as being admissible to establish an element of the crime for which the defendant is on trial. (*State v. Wright,* 194 Kan. 271, 398 P. 2d 339; and *State v. Cooper,* 83 Kan. 385, 111 Pac. 428.)

In *State v. Wright,* supra, it was said the rules of evidence incorporated in the new code of civil procedure were designed to have application to every proceeding, both criminal and civil, conducted by or under the supervision of the court, in which evidence is produced, except to the extent which they may be relaxed by other procedural rule or statute applicable to the specific situation. (K. S. A. 60-402.) In the opinion the court said:

"The rule of evidence stated in 60-455, *supra,* as applied to criminal proceedings has not materially changed the case law as it has developed in Kansas prior to the enactment of 60-455, *supra.*

"As early as the turn of the century the general rule was recognized that testimony as to the commission of offenses by a defendant in a criminal case, not in any way connected with that charged in the information, and which would tend to degrade and prejudice him, should be carefully excluded from the jury. (*State v. Kirby,* 62 Kan. 436, 63 Pac. 752.)

"Exceptions, however, were recognized to the foregoing rule. It was held that evidence which legitimately tends to support the charge or show the intent with which it is committed is not to be excluded on the ground that it will prove other offenses. (*State v. Kirby,* supra.)

"The general rule and the exceptions which developed have been repeatedly recognized and applied by many decisions of this court. . . . [citing cases.]" (p. 274.)

Kansas decisions do not bear out the appellant's contention that the admissibility of similar offenses, when relevant to prove a material fact at issue concerning the offense charged, is limited to prior offenses. Our decisions hold that the time of the similar offense and its relation to the offense charged goes only to the weight of the evidence. In *State v. Caton,* 134 Kan. 128, 4 P. 2d 677, it was said:

". . . The only difference between that case and the case under con-

sideration is that the crime testified about in the Frizell case occurred before the offense with which the defendant was charged, and in this case it occurred afterward. *This court has repeatedly held that if the evidence is otherwise admissible it is of no consequence whether the similar offense occurred prior or subsequent to the offense with which the defendant is charged.* The time of the similar offense and its relation to the offense charged goes only to the weight of the evidence. . . ." (pp. 130, 131.) (Emphasis added.)

In *State v. Keester,* 134 Kan. 64, 4 P. 2d 679, the court said:

". . . The court, contrary to the best authority (1 Wigmore on Evidence, 2d ed., § 359; 1 C. J. 329), and the rule of this court (*State v. Caton,* post, p. 136 [128]), directed the jury to disregard statements concerning subsequent acts, and no evidence of other abortions was offered." (p. 65.)

A recent decision upholding the foregoing rule is *State v. Poulos,* 196 Kan. 287, 411 P. 2d 689, Syl. ¶ 4, where the defendant objected to evidence of similar acts which occurred more than two years after the charge upon which he was being tried. It was argued the subsequent offense was so remote in point of time from the first as to be entirely irrelevant. The court, however, did not agree and held that remoteness in time of such evidence, otherwise admissible, affects the weight and probative value and not the admissibility of the evidence.

Other Kansas decisions adhering to this rule are *State v. King,* 111 Kan. 140, 206 Pac. 883; and *State v. Wahl,* 118 Kan. 771, 236 Pac. 652.

The appellant contends the testimony of Miss X should not have been admitted for another reason—that the testimony of Miss X concerned an offense for which the appellant had subsequently been charged and upon trial *acquitted.* It is argued that the acquittal operates as a bar to the state and prohibits any introduction of evidence concerning acts which tend to show the appellant criminally liable with respect to Miss X. He argues the acquittal has the effect of being conclusive under the doctrine of *res judicata* or collateral estoppel, citing *State v. Little,* 87 Ariz. 295, 350 P. 2d 756.

We have been cited to no Kansas cases on the point in question, and our limited research has disclosed none. We therefore view this point as one of first impression.

The position taken by the Supreme Court of the state of Arizona in *State v. Little,* supra, holding evidence of a similar offense for which the appellant has been acquitted inadmissible, is stated in the opinion as follows:

". . . We agree with the recognized exceptions to the general rule excluding evidence of former offenses, because that evidence is relevant, . . . Relevancy is thus not the sole test of the admissibility of evidence; admissibility depends, rather, on a balancing of the various effects of the admission of such evidence, considered in the light of recognized rules of law governing the administration of criminal justice.

"The fact of an acquittal, we feel, when added to the tendency of such evidence to prove the defendant's bad character and criminal propensities, lowers the scale to the side of inadmissibility of such evidence. The factors which lead us to this balancing may, perhaps, not be subject to precise articulation, but we note two points. . . . the relevance of the evidence of the prior offense depends upon the court's or jury's drawing two separate inferences, thus lessening the probative weight of such evidence; where the significance of such evidence must, if the doctrine of *res judicata* or collateral estoppel is to be given any effect, be determined in the light of the record and verdict of the former trial, the evidence of such former offense tends to become remote, speculative or confusing.

"Further, to the extent that evidence of the prior offense tends to prove the instant offense, the defendant is required, in order to avoid conviction and punishment for the instant offense, to refute, for the second time, his commission of the prior offense. A verdict of acquittal should relieve the defendant from having to answer again, at the price of conviction for that crime or another, evidence which amounts to a charge of a crime of which he has been acquitted." (p. 307.)

Well-considered authorities in other jurisdictions hold that the fact an accused was *acquitted* of a similar offense, otherwise admissible, does not bar the introduction of evidence thereof, but goes only to its weight. (*People v. Johnston,* 328 Mich. 213, 43 N. W. 2d 334; *People v. Simms,* 144 C. A. 2d 189, 300 P. 2d 898; *State v. Russell,* 62 Wash. 2d 635, 384 P. 2d 334; *People v. Lancaster,* 148 C. A. 2d 187, 306 P. 2d 626; *Commonwealth v. Manuszak et al., Aps.,* 155 Pa. Super. 309, 38 A. 2d 355; *Koenigstein v. State,* 101 Neb. 229, 162 N. W. 879; and *Taylor v. State,* 174 Ga. 52, 162 S. E. 504.)

A leading case which is frequently cited and quoted on this point is *Taylor v. State,* supra. In the opinion the court said:

"Nor is the contention sound that this evidence should have been ruled out because it relates to other alleged offenses for which this defendant had been previously tried and acquitted. While the defendant had been tried and acquitted of previous alleged offenses, and the verdict of not guilty may have indicated that there was not sufficient evidence to convince the jury beyond a reasonable doubt of his guilt, still that acquittal would not necessarily exclude the evidence, because that evidence may tend to illustrate the acts of the defendant as shown in the transaction for which he is now on trial, and may be considered in connection with the later evidence, and may throw a flood of light on this later evidence, though of itself insufficient to authorize a verdict

of guilty. In *Lee v. State*, 8 *Ga. App.* 413 (69 S. E. 310), it was said: 'while the general rule is that proof of other crimes committed by the defendant is not admissible in a criminal prosecution, still the general rule has many general exceptions . . . Though the defendant may have been tried for violating the law as to one or more of these transactions with other patients, and acquitted, the State may nevertheless prove the facts connected with them, for the purpose of illustrating the defendant's state of mind as to the transaction at bar.' In 1 Wharton's Criminal Evidence, 195, § 48, it is said: 'The question has been raised in criminal trials whether a previous indictment for, or acquittal or conviction of, the other crime, has any effect upon the admissibility of the evidence of such other crime. It may be safely stated that the almost universal judgment is that neither of these circumstances will operate to the rejection of such evidence . . . It has been sometimes strenuously urged that while an indictment or a conviction might be admissible, yet where the fact is that the accused has been acquitted of the crime sought to be used as evidence, that fact should render it inadmissible, as to receive it would be to put the accused again in jeopardy and would also contravene the record. But the courts which have spoken upon the subject have all said, in substance, that he could not be put in jeopardy of a crime of which he had been acquitted, but that he was in jeopardy of the crime for which he was being tried; and that evidence of the transactions which had resulted in his acquittal was admissible if competent to show a fact material to the issue being tried.' . . ." (pp. 67, 68.)

The offense charged against the appellant in the instant case involves a specific intent. As defined by statute, however, it is not of such nature that the intent, which the jury must find to be established by the evidence beyond a reasonable doubt in order to convict, may be inferred from the mere fact that on a certain occasion an electronic device was applied to a pregnant woman thereby causing her to abort. In a case of this character it may not be possible to interpret and properly characterize the specific act involved except by reference to a definite and continued course of conduct, plan or system, of which it is a part. The law should not be so construed as to make defendants in such cases conviction proof. (*People v. Johnston*, supra.)

The appellant in his testimony said he did not ever knowingly perform the treatment on a woman for the procuring of or causing an abortion. He continued:

". . . There are many ways to determine pregnancy. However, the lab test is the only one conclusive I would say. . . . The urine test is the one I rely upon."

He further testified that he relied upon those tests before giving any treatment; that it was the only protection he had.

If the state was to sustain the burden of proof in the instant case, it was necessary to prove the intent with which the appellant

committed the act in question by showing these so-called tests to be sham. For this purpose the acts of a similar nature and the circumstances under which they were committed were relevant.

We think the reasoning applied by the Georgia court in *Taylor v. State,* supra, is persuasive and therefore hold, under the circumstances heretofore disclosed by the facts in this case, the trial court properly admitted the testimony of Miss X concerning a subsequent offense for which the appellant was charged and acquitted, as bearing upon proof of the appellant's intent—an element of the offense charged.

The appellant in his defense called the director of a private clinical laboratory in Wichita where the pregnancy tests were made. He testified that he had been engaged in that business for twenty years; that the laboratory is state approved and that he made pregnancy tests, which included the laboratory findings. He testified they made quite a few, and on August 30, 1963, he made a pregnancy test upon Mrs. A, the result of which was negative. He testified that he was the chief technologist and the tests were all under his supervision. He also said that he had received a B. S. degree from Wichita University in chemistry and bacteriology which he thought was conferred in 1949.

He testified that when he made an examination for pregnancy, he made a report that went to the doctor. He said further:

"We make the test from the doctor. A person just don't walk in and say, 'We want a pregnancy test.' In fact, a very large percent of the people don't even know we exist. The request is made by a red piece of paper states what is requested. If it is a pregnancy test a urine sample is obtained for us and as far as a blood count is concerned we take that from the finger. Mrs. [A] [name omitted] came to our place for that test. I got different materials which I needed to take the urine and blood tests. I didn't examine the urine at her request, yes, it would be after all. *She submitted the specimen to us so she would be involved.* From the test I made on her that day my conclusion as to her being pregnant or not is that it was negative. As to her being pregnant or not, it was negative." (Emphasis added.)

The state in rebuttal introduced the testimony of a woman employed by Wichita State University who worked in the records department. Her testimony was to the effect that at the request of the prosecuting attorney, she had made a search of the records at the university concerning the laboratory technician who had testified for the appellant; and that according to the records she could not find anything on him, and such evidence indicates he was not

a graduate of Wichita State University and had never attended there.

The appellant specifies as error the admission of the foregoing rebuttal testimony, contending that the laboratory technician who testified was not put on the stand as an expert witness, but only as a laboratory technician who made the test; that the rebuttal testimony went only to a collateral issue which the jury was not called upon to decide; and that such rebuttal testimony greatly prejudiced the jury. It is contended the appellant had no knowledge of this matter, or of any falsity in the laboratory technician's testimony. It is argued this coupled with the instruction of the court, that when a witness makes an untrue statement the jury may disregard his entire testimony, in effect, permitted the jury to negate the entire testimony of the laboratory technnician.

At the trial no objection was made to the testimony of the foregoing rebuttal witness. Under these circumstances its admission, even if erroneous, cannot be urged as a cause for reversal. (*State v. Donahue,* 197, Kan. 317, 416 P. 2d 287.)

Even assuming that a proper objection had been made, the inquiry of the laboratory technician concerning a collateral matter and his answer may be material and highly important to the end that the triers of the fact may properly and intelligently weigh the testimony in the cause. If the subject of collateral inquiry is so connected with the matter at issue as to have a legitimate tendency to prove or disprove some fact that is material by giving weight and probability to, or detracting from, the testimony of a witness thereto, it is sufficient and makes the testimony material. (*State v. Whitlock,* 138 Kan. 602, 27 P. 2d 262.)

In the instant case the testimony of the laboratory technician was vitally material to the appellant's defense, in that his testimony tended to negative the required intention of the appellant to commit the act for which he was charged. The rebuttal testimony directly affected the credibility and weight of the testimony given by the laboratory technician. It was the appellant who directed Mrs. A, Miss X and Miss Y to the clinical laboratory in question, and it was the appellant who called the laboratory technician to testify on his behalf. It was also the appellant who first brought out the educational background and qualifications of the laboratory technician, and not the state.

The state in rebuttal also called two law enforcement officials,

one a special agent of the Federal Bureau of Investigation, and the other a detective captain of the Wichita Police Department. Both saw the appellant at his office in El Dorado on the 24th day of September, 1964, and after advising the appellant of his legal rights, testified that the appellant admitted performing abortions in the area, and admitted that he performed anywhere between five to ten in an average month. The Wichita police officer was also present on a prior occasion in the appellant's office, September 3, 1964, with an agent of the Kansas Bureau of Investigation when similar admissions were made by the appellant after having been advised of his legal rights.

The appellant specifies as error the admission of the testimony of these law enforcement officers in rebuttal. The appellant contends it was upon cross examination that he was asked if he had committed any other abortions in Butler County. His answer to this question was in the negative. The appellant argues on appeal that the state was bound by his answer, citing *State v. Hays,* 113 Kan. 588, 215 Pac. 1109; and *State, ex rel., v. Stout,* 101 Kan. 600, 168 Pac. 853, and cases from other jurisdictions.

The record fails to disclose any objection to the rebuttal testimony of these two officers at the trial. Ordinarily, under these circumstances the appellant would be precluded from raising the question on appeal. (*State v. Donahue,* supra.)

Furthermore, it was on direct examination of the appellant, while testifying in his defense, that he opened the door to such inquiry, and laid the basis for the rebuttal evidence of the two law enforcement officials. He was asked:

"Q. Have you ever knowingly performed the treatment for the procuring or causing an abortion?
"A. No, sir."

On this state of the record the rebuttal testimony of these law enforcement officers would be proper. (*State v. Freeman,* 195 Kan. 561, 408 P. 2d 612.) This rebuttal evidence clearly went to refute the appellant's defense. Unlike *State v. Stephenson,* 191 Kan. 424, 381 P. 2d 335, the admissions by the appellant in the instant case concerned his commission of similar acts, and the admissions offered to rebut his testimony had a bearing upon his intention to commit the act for which he was on trial. (See, *State v. Poulos,* supra.)

The appellant relies upon *Henry v. Mississippi,* 379 U. S. 443, 13 L. Ed. 2d 408, 85 S. Ct. 564; and *Escobedo v. Illinois,* 378 U. S.

478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, for the proposition that it was unnecessary to object to the rebuttal testimony of the two law enforcement officials concerning his admissions, on the grounds that confessions and admissions are not admissible in evidence under constitutional safeguards, if made in the absence of an attorney. We fail to see merit in this argument.

Assuming, without deciding, that it was unnecessary to object at the trial to the rebuttal testimony of these two law enforcement officials concerning the appellant's admissions, on appellate review it cannot be said the trial court erred in receiving such testimony in evidence.

In April, 1965, when the appellant stood trial, the decision in *Escobedo* had not been extended by the United States Supreme Court to include factual situations which did not come within the scope of its ruling. The trial in the instant case was prior to the decision in *Miranda v. Arizona*, 384, U. S. 436, 16 L. Ed. 2d 694 L. 2d 694, 86 S. Ct. 1602, which does not have retroactive application. (*Johnson v. New Jersey*, 384 U. S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772.)

In the instant case the appellant was not charged with a felony but a misdemeanor. He did not request to confer with counsel, nor was he refused the right to confer with counsel, prior to making the admissions to the law enforcement officials. He was not being detained and was not incarcerated by the police under the suspicion of committing a felony at the time he made the admissions. He did not admit guilt for the crime upon which he presently stands charged. He therefore did not make a confession. Under these circumstances this court has held oral admissions to have been properly received in evidence. (*State v. Turner*, 193 Kan. 189, 392 P. 2d 863, Syl. ¶ 8.)

Upon a careful review of the record presented on appeal in the instant case, the appellant has failed to make it affirmatively appear that the trial court erred.

The judgment of the lower court is affirmed.

FATZER, J., dissenting: I must respectfully dissent from the court's holding in paragraph 4 of the syllabus and the corresponding portion of the opinion. To approve the admission in evidence of the testimony of the witness referred to in the opinion as Miss X, is completely foreign to my notion of a fair trial. A defendant should

not be required, in order to avoid conviction and punishment for the offense for which he is being tried, to refute for the second time his commission of a similar prior or subsequent offense of which he has been acquitted.

In my opinion, the admission of this evidence was prejudicial to the substantial rights of the defendant despite the court's instruction to the jury as to how the evidence was to be received and considered by it. I would reverse the conviction.